Case 2:23-cv-00899-WSH Document 8 Filed 05/26/23 Page 1 of 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW HARRIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No.:** 23-899 |
| | : | |
| **GUARDIAN ELDER CARE AT MONONGAHELA, LLC; GAUDIAN HEALTHCARE HOME OFFICE I, LLC; GUADIAN HOME OFFICE II, LLC; GUARDIAN HEALTHCARE HOME OFFICE III, LLC; GUARDIAN HOME OFFICE IV, LLC; GUARDIAN HEALTHCARE MANAGEMENT SERGVICES HOLDCO, LLC; GUARDIAN HEALTHCARE OME CORP HOLDCO, INC.; GUARDIAN HEALTHCARE OME LLC 99%HOLDCO, LLC; GUARDIAN ELCERCARE FOUNDATION; d/b/a GUARDIAN ELDER CARE and HAVENCREST HEALTHCARE AND REHABILITATION CENTER,** | : : : : : | |
| | | |
| **Defendants.** | | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes Plaintiff, Matthew Harris, by and through the undersigned counsel, J.P. Ward & Associates, LLC., and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, Guardian Elder care at Monongahela Healthcare and Rehabilitation Center, of which the following is a statement:

**PARTIES**

1. Plaintiff, Matthew Harris ("Plaintiff" or "Mr. Harris""), is an adult individual who currently resides at 117 11TH St., Donora, Washington County, PA.

2. Defendants, GUARDIAN ELDER CARE AT MONONGAHELA, LLC; GAUDIAN HEALTHCARE HOME OFFICE I, LLC; GUADIAN HOME OFFICE II, LLC; GUARDIAN HEALTHCARE HOME OFFICE III, LLC; GUARDIAN HOME OFFICE IV, LLC; GUARDIAN HEALTHCARE MANAGEMENT SERGVICES HOLDCO, LLC; GUARDIAN HEALTHCARE OME CORP HOLDCO, INC.; GUARDIAN HEALTHCARE OME LLC 99%HOLDCO, LLC; GUARDIAN ELCERCARE FOUNDATION; d/b/a GUARDIAN ELDER CARE and HAVENCREST HEALTHCARE AND REHABILITATION CENTER, are doing business collectively as "Guardian Healthcare". Defendants have a principal place of business located at 1227 Country Club Rd., Monongahela, PA, 15603. Defendants are referred to as "Defendants" or "Havencrest."

## JURISDICTION AND VENUE

3. This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e et seq., the Pennsylvania Human Relations Act ("PHRA") 43 P.S. §§ 951-963 and Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981.

4. This Court has jurisdiction over Mr. Harris' discrimination claims pursuant to 28 U.S.C. § 1331.

5. Mr. Harris is a resident and citizen of Pennsylvania, a substantial amount of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

6. On July 14, 2022, Mr. Harris filed a timely charge with the Equal Employment Opportunity Commission ("EEOC").

7. On February 28, 2023, Mr. Harris was issued the Notice of Suit Rights from the EEOC and the Complaint now timely follows.

**PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS**

8. In September 2020, Mr. Harris was hired as a full-time employee with Havencrest in the role of a Licensed Practical Nurse ("LPN"). Mr. Harris had previously worked for Havencrest through a staffing agency.

9. At all times relevant, Mr. Harris was an African American male and was highly qualified to perform the essential functions of his job duties given his 12 years as an LPN. Additionally, Mr. Harris was one of three licensed African American males employed at Havencrest.

10. As an LPN, Mr. Harris's essential job functions required him to complete the passing of medication to patients, wound care, evaluation of patients for the day, complete charting, and administer treatments.

**A. Sexual Harassment**

11. In October 2020, Defendant's Nurse Supervisor, Chrissy Kuhn ("Ms. Kuhn"), a white female Registered Nurse, began to sexually harass Mr. Harris.

12. At all times relevant, Ms. Kuhn's sexual harassment of Mr. Harris was unwanted and unwelcome.

13. Ms. Kuhn sexually harassed Mr. Harris by groping, caressing, and smacking his buttocks. On more than one occasion, Ms. Kuhn would leave her hand on Mr. Harris's buttocks for a second and then squeezed it prior to removing her hand.

14. Ms. Kuhn's sexual harassment of Mr. Harris continued for the entirety of Mr. Harris's employment with Defendant.

15. Mr. Harris reported Ms. Kuhn's continued sexual harassment to Defendant's Director of Nursing, Laura Shaner ("Ms. Shaner"). Ms. Shaner stated, whilst audibly laughing, "That is how she [Ms. Kuhn] is and I will talk with her."

16. Ms. Shaner acted as if Mr. Harris's report of sexual harassment was a joke due to his gender as a male. It is unclear if Ms. Shaner ever spoke or reported to Defendant's Human Resources Department concerning Mr. Harris's report of sexual harassment as she did not ask Mr. Harris give a formal written statement.

17. On November 3, 2020, Ms. Kuhn, arriving early for her shift, proceeded to find Mr. Harris, who was already on his med cart passing mediation to his patients. Ms. Kuhn came up behind Mr. Harris and proceeded to grab and smack his buttocks stating "oooh its firm" whilst squeezing his buttocks.

18. Ms. Kuhn quickly iterated to Mr. Harris that the sexual harassment she was subjecting him to was "not sexual." Ms. Kuhn would go on to touch Mr. Harris's buttocks three to five times for the next two hours.

19. Before the end of shift, Mr. Harris became overwhelmed and upset with the continuous sexual harassment from Ms. Kuhn, and Havencrest's blatant refusal to take corrective action. Mr. Harris personally confronted Ms. Kuhn.

20. Mr. Harris asked Ms. Kuhn "why are you [Ms. Kuhn] always touching me?" Further, Mr. Harris explained to Ms. Kuhn that her sexual harassment and inappropriate touching were unwelcome and unwanted.

21. Following the confrontation of Ms. Kuhn, Mr. Harris immediately went to Ms. Shaner's office to report Ms. Kuhn's sexual harassment once again.

22. Ms. Shaner, not wanting to be bothered by Mr. Harris, derected Mr. Harris to the Human Resources Representative, Julie Graff ("Ms. Graff").

23. During Mr. Harris's conversation with Ms. Graff, he reported the same inappropriate behavior and sexual harassment by Ms. Kuhn that was previously reported to Ms. Shaner and the inability to perform the essential functions of his job due to the uncertainty of Ms. Kuhn coming up behind him to grope, caress, and smack his buttocks.

24. Ms. Graff also laughed and stated, "That is just how Ms. Kuhn is."

25. Havencrest was clearly aware of Ms. Kuhn's sexual harassment of its employees and refused to correct the situation. Ms. Kuhn did not hide her sexual harassment and openly touched, caressed, and/or groped Havencrest's employees in front of Nurse Supervisors, Unit Managers, and Administration.

26. Due to the continual sexual harassment and refusal to take any corrective action, Mr. Harris began to feel overwhelmed and stress.

27. Mr. Harris found it necessary to take a sabbatical from his employment with Havencrest and pursue other means of income.

28. In July 2021, Mr. Harris returned to his employment with Defendant after receiving a phone call from Havencrest asking if he would return due to a staff shortage.

29. Shortly after Mr. Harris returned, Ms. Kuhn started sexually harassing him again.

30. Mr. Harris didn't feel comfortable reporting the sexual harassment again because Havencrest had previously failed and refused to follow policy and procedure regarding such incidents. He knew that reporting the situation would be seen as a joke and dismissed due to his gender.

31. On October 16, 2021, Mr. Harris was physically assaulted by Certified Nursing Assistant, Paulette Getchy ("Ms. Getchy").

32. Mr. Harris observed Ms. Getchy fail to change her soiled gloves before attending to the next patient. Mr. Harris had a discussion with her regarding proper hand hygiene and the correct use of gloves.

33. In response, Ms. Getchy waited for Mr. Harris to come into the next patient's room and to bend over to spoon feed the patient their medications. At that time Ms. Getchy took the opportunity to smack the back of Mr. Harris's neck with the soiled gloves as hard as she could.

34. Ms. Getchy created a safety hazard for the patient as Mr. Harris could have fallen on top of the patient causing injury.

35. Mr. Harris raised his voice toward Ms. Getchy for her actions. Ms. Getchy threatened Mr. Harris with continued physical violence by having her boyfriend come to Havencrest and attack him.

36. Mr. Harris went to the Human Resource Office to report Ms. Getchy verbal and physical attack on him.

37. On October 18, 2021, Mr. Harris was greeted by Ms. Shaner and Assistant Director of Nursing, Cassie Trippy ("Ms. Trippy") in regard to his report of Ms. Getchy. Ms. Shaner immediately stated to Mr. Harris "you need to stop making these complaints, women feel uncomfortable enough as it is with the Harvey Weinstein issues and the ME TOO movement."

38. Mr. Harris, defending himself, told Ms. Shaner "I am the one being sexually harassed here and touched inappropriately. I have never forced myself on anyone and I have nothing to do with the ME TOO movement."

39. Ms. Shaner retracked her statement and told Mr. Harris that she would speak with Ms. Getchy and ensured they would not work in the same hallway again.

40. However, Ms. Shaner again did not have Mr. Harris make a formal statement discussing the physical attack by Ms. Getchy nor Ms. Kuhn's continued sexual harassment.

41. In October 2021, following his interaction with Ms. Shaner and Ms. Trippy, Mr. Harris went to Havencrest's Scheduler, Trish LNU ("Ms. Trish") and told her that he wanted to change his schedule and only work every other weekend.

42. Ms. Trish asked Mr. Harris "Why do you want to change your schedule?" Mr. Harris replied, "You know why I want to change my schedule!"

43. Mr. Harris began to work every other weekend and would pick up shifts as needed when Havencrest would contact him.

44. However, Ms. Trish scheduled Mr. Harris on the same weekend that Ms. Kuhn worked even though she was fully aware of the sexual harassment he was subjected to.

45. On the occasions Havencrest was short staffed, Ms. Trippy would work on the unit during the day shift. As such, Mr. Harris would take over for Ms. Trippy on the med cart at the end of her shift.

46. While working with Ms. Trippy, Mr. Harris would report to her the continual sexual harassment he was being subjected to by Ms. Kuhn. Mr. Harris did this in hopes that Ms. Trippy would relay the report to Ms. Shaner or Ms. Graff so an investigation and/or corrective action would be taken.

47. However, Mr. Harris's reports to Ms. Trippy fell on deaf ears as Ms. Kuhn's sexual harassment and inappropriate touching remained unchecked.

**B. Retaliation and Termination**

48. In February 2022, Havencrest began to retaliate against Mr. Harris for the repeated reports of sexual harassment by falsely creating a paper trail of disciplinary action for allegedly failing to properly complete his skilled nursing notes.

49. On February 19, 2022, Ms. Shaner called Havencrest to "remind" Mr. Harris to complete his charting. Mr. Harris quickly told her "Yeah ok" because he was busy performing the essential functions of his job.

50. On February 22, 2022, Ms. Shaner again interrupted Mr. Harris's job duties by calling Havencrest to "remind" him to complete his charting. Ms. Shaner repeatedly harassed and held Mr. Harris to a heightened level of scrutiny regarding the completion of his skilled nursing charting.

51. Ms. Shaner did not harass Mr. Harris's similarly situated white counterparts in the way she did with Mr. Harris. For example, Ms. Kuhn was a known bragger of not completing her skilled nurse charting.

52. On March 5, 2022, Ms. Kuhn snuck up behind Mr. Harris placing her hands on his buttocks, and squeezed as hard as she could. Ms. Kuhn proceeded to smile at Mr. Harris from the gratification of knowing she was not going to receive any corrective action from Havencrest for continual sexual harassment. Ms. Kun was openly mocking and harassing Mr. Harris.

53. Mr. Harris was then called to Ms. Shaner's office for a "re-education" on how to complete his charting.

54. The weekend of March 19, 2022 and March 20, 2022, Mr. Harris was approached by Registered Nurse Supervisor, Patty Davies ("Ms. Davies") asking him if he needed help with

completing his charting. Mr. Harris accepted the help from Ms. Davies because he was behind in his tasks.

55. However, Ms. Davies deceitfully asked Mr. Harris if he needed help completing his charting and failing to complete the charting in order to have him terminated. Ms. Davies was also known to not complete her skilled nursing charting nor any of her job duties associated with her role as Nurse Supervisor.

56. On March 24, 2022, Havencrest unlawfully terminated Mr. Harris's employment for the pretextual reasoning of not completing his charting from his shifts on March 19, 2022 and March 20, 2022.

**COUNT I**
**SEX DISCRIMINATION**
**IN VIOLATION OF TITLE VII AND THE PHRA**

57. Mr. Harris incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

58. Under Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), it is illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

59. To make a prima facie claim of discrimination under Title VII, a plaintiff must show, "(1) she is a member of a protected class; (2) she satisfactorily performed the duties required by her position; (3) she suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that could give rise to an inference discrimination." *Langley v. Merck* & Co.,

186 Fed Appx. 258, 259 (3d Cir. 2006) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *McDonnell Douglas Corp. v. Green*, 411 U.S. 802 (1973)).

60. Under Title VII, for other employees to be considered "similarly situated," they must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morales v. Pnc Bank, N.A.*, 2012 U.S. Dist. LEXIS 143605, *23 (E.D. Pa. 2012) (citing *McCormick v. Allegheny Valley Sch.,* No. 06-3332, 2008 U.S. Dist. LEXIS 8533 (E.D. Pa. Feb. 4, 2008).

61. Mr. Harris is a member of a protected class under Title VII, and he satisfactorily performed the duties of his job at all times.

62. All performance issues alleged by Defendants were invented by Ms. Shaner to punish Mr. Harris for the repeated reports of sexual harassment made against Ms. Kuhn.

63. Mr. Harris suffered various adverse employment actions in the form of sexual harassment, retaliation, and ultimately termination.

64. Mr. Harris was regularly and severely harassed by Ms. Kuhn groping, caressing, and squeezing his buttock. However, even after his multiple reports to management and human resources, Havencrest failed to take his reports of sexual harassment seriously and laughed at this egregious violation of Title VII due to his sex as a male.

65. Mr. Harris was scrutinized more severely than other similarly situated female employees because of the stereotypical ideology "men cannot be sexually harassed."

66. Due to the stereotypical bias that men cannot be sexually harassed, Mr. Harris, a male employee in a similar position to his female coworkers, was subjected to more severe scrutiny than they were.

67. The actions of Defendants were intentional, knowing, and in reckless disregard to the rights of Plaintiff.

68. As a direct and proximate result of the aforementioned conduct, Mr. Harris suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, loss of reputation, humiliation, and severe inconvenience in the past, present, and future.

WHEREFORE, Plaintiff, Matthew Harris hereby respectfully requests this Honorable Court consider the above and grant relief in her favor, including back pay, reinstatement or front pay, compensatory damages, punitive damages, costs and reasonable attorney fees.

## COUNT II

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII AND THE PHRA

69. Mr. Harris incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

70. The protections established by Title VII include "protection against a hostile work environment that is abusive to an employee on the basis of his or her race." *Bryant v. Wilkes-Barre Hops., Co., LLC*, 146 F. Supp. 3d 628, 645 (M.D. Pa. 2015).

71. In order to bring a claim under Title VII for a sexually hostile work environment, a plaintiff must prove, "(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir. 1990).

72. The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. See *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

73. Because Complainant is able to state a prime facie case for race discrimination and hostile work environment under Title VII, so too will he be able to state such a claim under the PHRA.

74. The United States Supreme Court "has held that when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII . . . is violated." *Washington v. Martinez*, 2004 U.S. Dist. LEXIS 4325 at *16 - *17 (E.D. Pa. 2004).

75. Courts have held that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Washington* at *17 - *18 (quoting *Harris v. Forklift Sys*., 510 U.S. 17, 22 (1993)).

76. Conditions that create a hostile working environment "may constitute a significant change in benefits and establish the adverse action necessary to state a prima facie case of discrimination." *Washington* at *17.

77. Employment discrimination on the basis of sex, made unlawful by Title VII, is not limited to tangible or economic discrimination and thus includes employers requiring individuals "to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys*., 510 U.S. 17, 21 (1993).

78. Where a harassing employee is the plaintiff's supervisor, "an employer may be vicariously liable for its employees' creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 428 (2013).

79. "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employees work performance." *Harris*, 510 U.S. at 23.

80. Mr. Harris faced a hostile work environment in the form of sexual harassment throughout his employment with Havencrest. Mr. Harris was consistently sexually harassed by Ms. Kuhn.

81. As a result, Mr. Harris experienced difficulty in performing the essential functions of his job.

82. The sexual harassment and Havencrest's failure to take corrective action detrimentally affected Mr. Harris in that he took a sabbatical from his employment with Havencrest.

83. As a direct and proximate cause of the aforementioned conduct, Mr. Harris suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

84. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Matthew Harris hereby respectfully requests this Honorable Court consider the above and grant relief in her favor, including back pay, reinstatement or front pay, compensatory damages, punitive damages, costs and reasonable attorney fees.

**COUNT V**
**RETALIATION IN VIOLATION OF TITLE VII AND THE PHRA**

85. Mr. Harris incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

86. The Title VII antiretaliation provision makes it an unlawful employment practice for an employer to discriminate against their employees for making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing regarding Title VII discrimination. *Crawford v. Metro Gov't of Nashville and Davidson County*, 555 U.S. 271, 274 (2009) (citing 42 U.S.C. § 2000e-3(a)).

87. In order for a plaintiff to establish a prima facie case of retaliation under Title VII, she must demonstrate "(1) that she engaged in a protected activity, which can include informal protests of discriminatory employment practices such as making complaints to management; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the protected activity and the adverse action." *Moore v. Sec'y United States Dep't of Homeland Sec.*, 718 F. App'x 164, 167 (3d Cir. 2017) (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

88. Complaints made by an employee to an employer regarding discrimination must be specific enough to notify the employer of the specific type of discrimination at issue. *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3rd Cir. 2010).

89. A causal connection may be established in part by illustrating that the individuals responsible for the adverse employment decisions were aware of the employee's protected activity. See Id. at 288.

Case 2:23-cv-00892-WSH Document 80 Filed 07/26/23 Page 15 of 20

90. The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. See *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

91. Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv.*, 390 F.3d 760, 764 (3d Cir. 2004)).

92. "When the temporal proximity between the protected activity and adverse action is unduly suggestive, this is sufficient standing alone to create an inference of causality…" *Lichtenstein v. University of Pittsburgh Medical Center* 691 F.3d 294, at 307 (3d Cir.2012), citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3rd Cir.2007).

93. Following the unwanted and unwelcome sexual harassment, Mr. Harris engaged in a protected activity by reporting Ms. Kuhn's conduct to superiors and human resources.

94. In response, Ms. Shaner began to retaliate against Mr. Harris by creating a false paper trail of not completing skilled nurse charting against him which she knew would lead to Mr. Harris's termination.

95. On March 24, 2022, Havencrest terminated Mr. Harris's employment under false pretenses.

96. The actions of Defendant were intentional, knowing, and in reckless disregard to the rights of Plaintiff.

97. As a direct and proximate result of the aforementioned conduct, Mr. Harris suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, loss of reputation, humiliation, and severe inconvenience in the past, present, and future.

WHEREFORE, Plaintiff, Matthew Harris hereby respectfully requests this Honorable Court consider the above and grant relief in her favor, including back pay, reinstatement or front pay, compensatory damages, punitive damages, costs and reasonable attorney fees.

**COUNT VI**

**RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII AND THE PHRA**

98. Mr. Harris incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

99. Under Title VII, it is illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. §2000e-2(a)(1).

100. When analyzing a claim of discrimination under Title VII, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the action occurred under circumstances that could give rise to an inference of intentional discrimination." Langley v. Merck & Co., 186 Fed Appx. 258 (3d Cir. 2006) (citing McDonnell Douglas Corp. v. Green, 36 L. E.D. 29 668 (1973). See also Makky v. Chertoff, 542 F.3d 205, 214 (3d Cir. 2008).

101. The same legal standards apply to Title VII and PHRA claims. Connelly v. LaneConstr. Corp., 809 F.3d 780, 791 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 (3d Cir. 2000)). Further, the same standards apply to claims under Title

VII and the PHRA on a summary judgment motion. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). Accordingly, the Court's analysis of the Title VII claims also applies to the PHRA claims. Phillips v. Septa, CIVIL ACTION NO. 16-0986, 6-7 (E.D. Pa. Feb. 12, 2018).

102. Under Title VII, for other employees to be considered “similarly situated,” they must have “engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer’s treatment of them for it.” Morales v. Pnc Bank, N.A., 2012 U.S. Dist. LEXIS 143605 *23 (E.D. Pa. 2012).

103. Pennsylvania courts have held that comparison factors for “similarly situated employees” have included “dealing with the same supervisor, having been subject to the same standards, and engaging in the same conduct without differentiating and mitigating circumstances.” Id.

104. A plaintiff may also satisfy the fourth element by “showing other circumstances that give rise to an inference of unlawful discrimination.” Senador v. Zober Indus., 2009 U.S. Dist. LEXIS 36059 *9 (E.D. Pa. 2009).

105. Mr. Harris was an African American employee who was highly qualified for his position given his 12 years as an LPN.

106. Mr. Harris was one of the only African American LPNs employed by Havencrest.

107. The similarly situated white LPNS and Registered Nurses were treated more favorably than Mr. Harris in that Havencrest did not take any form of corrective action against them related to completion of their skilled nurse charting.

108. In fact, a similarly situated white Registered Nurse was a known bragger of never completing her skilled nurse charting and not receiving any form of corrective action.

109. Havencrest terminated Mr. Harris for this same violation of policy that it allowed the similarly situated white LPNs and Registered Nurses to do.

110. As a direct and proximate cause of the aforementioned conduct, Mr. Harris suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

111. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Matthew Harris hereby respectfully requests this Honorable Court consider the above and grant relief in her favor, including back pay, reinstatement or front pay, compensatory damages, punitive damages, costs and reasonable attorney fees.

## COUNT VII
## RACIAL DISCRIMINATION IN VIOLATION OF SECTION 1981

112. Mr. Harris incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

113. 42 U.S.C. § 1981(a) provides that:

> "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens."

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); *see also*, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

114. Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

115. Defendant perpetuated the racial discrimination of Mr. Harris in the workplace as delineated hereinabove.

116. Mr. Harris was held to a more arduous standard than his similarly situated white LPNS and Registered Nurses and was disparately treated by his supervisor based on his race.

117. The similarly situated white LPNS and Registered Nurses were treated more favorably than Mr. Harris in that Havencrest did not take any form of corrective action against them related to completion of their skilled nurse charting.

118. On March 24, 2022, as a result of this racial discrimination, Mr. Harris was subjected to the ultimate adverse employment action when he was terminated and therefore deprived of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

119. Defendant's actions against Mr. Harris were undertaken with reckless indifference to his federally protected right to make and enforce contracts irrespective of his race.

120. As a direct and proximate result of the aforementioned conduct, Mr. Harris suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience all in the past present and future.

121. As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Matthew Harris, hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendant, including an award of front pay, back pay, compensatory and punitive damages, costs and reasonable attorney's fees.

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: May 26, 2023

By: */s/ Joshua P. Ward*
Joshua P. Ward (Pa. I.D. No. 320347)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Counsel for Plaintiff